Slip Op. 17-65

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHEJIANG NATIVE PRODUCE & ANIMAL BY-PRODUCTS IMPORT & EXPORT GROUP CORP., : : : | |
| Plaintiff, : | |
| v. : | Before: Richard K. Eaton, Judge |
| UNITED STATES, : | Court No. 04-00268 |
| Defendant, : | |
| and : | |
| THE AMERICAN HONEY PRODUCERS ASSOCIATION and THE SIOUX HONEY ASSOCIATION, : : : | |
| Defendant-Intervenors. : | |

## <u>OPINION</u>

[United States Department of Commerce's Final Results of Redetermination are sustained.]

Dated: June 1, 2017

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for plaintiff. With him on the brief were *Bruce M. Mitchell* and *Andrew T. Schutz*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General; *Jeanne E. Davidson*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Nanda Srikantaiah*, Of Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Michael J. Coursey* and *Joshua R. Morey*, Kelley Drye & Warren LLP, of Washington, DC, argued for defendant-intervenors. With them on the brief was *R. Alan Luberda*.

Eaton, Judge: This case involves the final results of the first administrative review of the antidumping duty order on honey from the People's Republic of China ("PRC"). *Honey From the PRC*, 69 Fed. Reg. 25,060 (Dep't Commerce May 5, 2004) (final results), PR 113 and accompanying Issues and Decision Mem. (Apr. 28, 2004), PR 107 ("Decision Mem."), *as amended by* 69 Fed. Reg. 32,494 (Dep't Commerce June 10, 2004), PR 118, ECF No. 100 (collectively, "Final Results"). Before the court are the United States Department of Commerce's ("Commerce" or the "Department") Final Results of Redetermination after remand. *See* Final Results of Redetermination Pursuant to Remand (Feb. 10, 2016), ECF No. 83 ("Remand Results").

Plaintiff Zhejiang Native Produce & Animal By-Products Import & Export Group Corp. ("plaintiff" or "Zhejiang") challenges Commerce's determination of the normal value of honey exported to the United States by Zhejiang during the period covered by the review. Plaintiff argues that Commerce unreasonably failed to use the best available information on the record to calculate the surrogate value of Zhejiang's raw honey input. Plaintiff also contests Commerce's adjustment of the raw honey price to account for inflation during the covered period. Finally, plaintiff maintains that Commerce unreasonably failed to average the 2001-2002 and 2002-2003 financial statements of an Indian honey cooperative when calculating surrogate financial ratios. *See* Pl.'s Cmts. Remand Results, ECF No. 90 ("Pl.'s Cmts.") at 1-3.

The United States Government ("defendant" or the "Government"), on behalf of Commerce, argues that the Remand Results are reasonable, supported by the record, and should be sustained. *See* Def.'s Reply Cmts. Remand Results, ECF No. 99 ("Def.'s Reply"). Defendant-intervenors the American Honey Producers Association and the Sioux Honey Association (collectively, "defendant-intervenors") join the defendant in urging the court to sustain the

Remand Results. *See* Def.-Ints.' Cmts. Remand Results, ECF No. 89; Def.-Ints.' Reply Pl.'s

Cmts. Remand Results, ECF No. 97.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012) and 19 U.S.C.

§ 1516a(a)(2)(B)(i) (2012).[1] For the reasons set forth below, the court sustains the Remand

Results.


# BACKGROUND

In January 2003, Commerce initiated the first administrative review of the antidumping

duty order on honey from the PRC. *See* Initiation of Antidumping and Countervailing Duty

Admin. Revs. and Req. for Revocation in Part, 68 Fed. Reg. 3009 (Dep't Commerce Jan. 22,

2003) (notice). The period of review covered the period of February 10, 2001, though November

30, 2002 ("Original POR"). Decision Mem. at 3.

Because the PRC is a nonmarket economy country, Commerce determined normal value

for Zhejiang's sales during the Original POR using the factors of production methodology

provided for in 19 U.S.C. § 1677b(c). Commerce selected India as the source of surrogate data to

value Zhejiang's factors of production, including raw honey, and to calculate financial ratios.

To value raw honey, Commerce used an average of raw honey prices from a March 2000

article entitled "Apiculture, a major foreign exchange earner" that was published in the *Tribune

of India*, an English language daily newspaper headquartered in Chandigarh, India (the "March

2000 *Tribune* article" or the "2000 article"). Decision Mem. at 9. The 2000 article indicated that

the sale price of honey in India ranged from Rs. 25 to Rs. 45 per kilogram. *See* Final FOP Mem.

---

[1]      Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2012 edition, and any applicable supplements.

for Zhejiang (Apr. 28, 2004), PR 1288, ECF No. 92 (citing Prelim. FOP Mem. for Zhejiang

(Dec. 10, 2003), Attach. 3, PR 858, ECF No. 92 ("Prelim. FOP Mem.")). Commerce chose the

2000 article as the source of surrogate data instead of another article from the *Tribune of India*,

proposed by plaintiff, which was published in March 2001 (the "March 2001 *Tribune* article" or

the "2001 article"). Decision Mem. at 21. The 2001 article, titled "Honey no longer a sweet

business," indicated that the production cost of honey in India was approximately Rs. 23 per

kilogram, and the procurement price was Rs. 24 per kilogram—*i.e.*, lower than the range of

prices in the March 2000 *Tribune* article. *See* Decision Mem. at 6. Commerce determined that

the 2000 article was the best information available because it was public, specific to the Indian

honey industry, and representative of the honey industry throughout India. Decision Mem. at 10.

Using the prices in that article, Commerce calculated an average raw honey price of Rs. 35 per

kilogram. *See* Prelim. FOP Mem. at 2.

Next, Commerce adjusted the average raw honey price (Rs. 35 per kilogram) to reflect

what the price would have been during the Original POR, applying its inflation methodology.

*See* Prelim. FOP Mem. at 2-3. Under this methodology, the Department adjusted the price using

information in the record, including wholesale price indices ("WPI") for India published in

selected issues of the International Monetary Fund's *International Financial Statistics* and the

raw honey purchase prices paid by two Indian honey processors, Jallowal Bee Farm and Tiwana

Bee Farm. Prelim. FOP Mem. at 2; Decision Mem. at 16. Commerce found that the Jallowal and

Tiwana pricing information demonstrated that there were price increases during a portion of the

Original POR, *i.e.*, December 2001 to May 2002, that exceeded the general rate of inflation.[2] *See* Decision Mem. at 16. Accordingly, Commerce used the Jallowal and Tiwana pricing information to account for the observed price increases. Decision Mem. at 16 ("[I]n order to account for these significant raw honey price increases and consistent with our finding in *Wuhan's Final Results*, we find it appropriate and necessary to inflate the average raw honey price derived from pricing information in the March 2000 *Tribune* article, using [the Jallowal and Tiwana] documented purchase prices.").

To calculate surrogate financial ratios, Commerce used Mahabaleshwar Honey Production Cooperative Society, Ltd.'s ("MHPC") 2001-2002 financial statement as a source of data regarding factory overhead, selling, general, and administrative expenses ("SG&A"), and profit. Decision Mem. at 19. In doing so, it declined to use MHPC's 2002-2003 financial statement, as proposed by Zhejiang, because Commerce found that the 2001-2002 financial statement was more specific, reliable, and contemporaneous with the Original POR than MHPC's 2002-2003 financial statement. Decision Mem. at 19. Based on its findings in the Final Results, Commerce assigned Zhejiang an antidumping duty margin of 67.70 percent. *Honey From the PRC*, 69 Fed. Reg. at 32,495.

After the publication of the Final Results, Commerce amended the record to add eleven public documents received in response to a Freedom of Information Act request ("New

---

[2]     Petitioners proposed that Commerce use the Jallowal and Tiwana pricing information to value raw honey, but Commerce declined to use the information for that purpose because the information was limited to Punjab, *i.e.*, it was not representative of country-wide raw honey prices. Decision Mem. at 16. Commerce, however, determined to use the information for a different purpose, *i.e.*, to adjust the surrogate raw honey price calculated using the 2000 article to account for "the significant rate at which Tiwana's and Jallowal's documented raw honey purchase costs increased for the period December 2001, through May 2002." Decision Mem. at 16.

Information"). *See* Amendment to Admin. R. in Ct. No. 04-00268 (Nov. 19, 2004), ECF No. 28

("Amended Record"). The documents, which were not part of the underlying administrative

record, included correspondence between Commerce and the authors of articles published in the

*Tribune of India*, as well as communications with Indian agricultural and honey specialists.

In July 2004, plaintiff commenced suit in this Court contesting the Final Results. In

February 2005, defendant-intervenors filed a motion to dismiss plaintiff's action for lack of

jurisdiction, which the court denied. *See Zhejiang Native Produce & Animal By-Prods. Imp. &*

*Exp. Group Corp. v. United States*, 29 CIT 1300, 400 F. Supp. 2d 1374 (2005). Subsequently,

the court stayed this action pending the final disposition of Court No. 02-00057, a case in which

Zhejiang challenged, among other things, Commerce's affirmative critical circumstances

determination in the underlying investigation. *See* Order of Sept. 7, 2006, ECF No. 49.

In *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United*

*States*, 432 F.3d 1363 (Fed. Cir. 2005), the United States Court of Appeals for the Federal

Circuit held that in making its critical circumstances determination Commerce erred by using its

standard 25 percent method to impute knowledge of dumping to respondents, including

Zhejiang, during a period when a suspension agreement was in place. *Zhejiang*, 432 F.3d at

1366-68. On remand following the Federal Circuit's decision, Commerce made a negative

critical circumstances determination with respect to Zhejiang, which this Court affirmed.

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 37 CIT __,

Slip Op. 13-76 (June 18, 2013) (sustaining Commerce's third remand results). Commerce's

negative critical circumstances determination had the effect of shortening the period of review

for Zhejiang by ninety days, so that the period of review began on May 11, 2001 (instead of

February 11, 2001) and ended on November 30, 2002 ("Adjusted POR"). *See* Remand Results at

19. The Federal Circuit issued its final mandate on December 1, 2014, affirming this Court's ruling that Commerce's final determination, as supplemented in remand proceedings, was supported by substantial evidence and in accordance with law. *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 580 Fed. Appx. 906 (Mem.) (Fed. Cir. 2014).

On August 4, 2015, the court granted the Government's unopposed request for remand. *See* Order of Aug. 4, 2015, ECF No. 75. In light of the final resolution of Court No. 02-00057 and the New Information added to the record, the court directed Commerce to reconsider issues related to the surrogate value for raw honey; to review the proper source of the financial information used to calculate surrogate values for factory overhead, SG&A, and profit;[3] and to recalculate Zhejiang's dumping margin to reflect the Adjusted POR. *Id.*

On remand, Commerce revisited its selection of data to value raw honey in light of the New Information. Commerce found that the New Information indicated that both the 2000 article and the 2001 article reflected regional, not national, raw honey prices; that is, neither was representative of honey prices in all of India. Remand Results at 19. Commerce also determined that, although the 2001 article was closer to the Adjusted POR, both fell outside of the Adjusted POR. Remand Results at 19.

The Department determined, however, that, on balance, the 2000 article was the best available information, since the March 2001 *Tribune* article contained certain internal

---

[3]     The court remanded Commerce's choice of MHPC's 2001-2002 financial statement "because of the time that ha[d] passed between [Commerce's] initial determination and a decision in this case," noting that it was "not apparent to the court that this remand will necessarily result in any change on the part of Commerce's source of financial data" or its reasons for selecting that source. Order of Aug. 4, 2015, ECF No. 75.

inconsistencies that could not be cured by reference to other record evidence, including the New Information. Remand Results at 21 ("None of the new information on the record of this administrative review contradicts our analysis of this issue in the *Final Results*, nor does the information clarify the inconsistencies contained in the March 2001 article."). For example, the 2001 article stated that price suppression by imports from China, Argentina, Germany, and Australia had kept Indian prices down during a period when Indian government statistics showed that there were no imports from those countries. Remand Results at 20. Moreover, the 2001 article was not clear as to whether and to what extent the prices mentioned in the article were for honey sourced entirely in India. Remand Results at 20. Commerce found that the internal inconsistencies undermined the reliability of the 2001 article.  Remand Results at 21 ("[T]he internal inconsistencies that undermine[d] the reliability of the March 2001 article outweigh[ed] the fact that the March 2001 article prices [came] from a time period which [was] closer to the [Adjusted] POR."). Accordingly, on remand, Commerce continued to value raw honey using the Rs. 35 per kilogram average price derived from the March 2000 *Tribune* article, and again adjusted that price using Indian WPI and the Jallowal and Tiwana pricing information. *See* Remand Results at 23-25.

Regarding surrogate financial information, Commerce continued to rely on MHPC's 2001-2002 financial statement to value factory overhead, SG&A, and profit, rather than plaintiff's proposed source—MHPC's 2002-2003 financial statement. Remand Results at 27. As in the Final Results, Commerce found that MHPC's 2001-2002 financial statement was more specific, reliable, and contemporaneous with the Adjusted POR than its 2002-2003 financial statement. Remand Results at 26-27. Commerce also declined to average the two financial statements, as urged by plaintiff, citing its practice "not to average financial statements for the

same company when calculating surrogate values for financial ratios." Remand Results at 33

(citing *Honey From the PRC*, 70 Fed. Reg. 9271 (Dep't Commerce Feb. 25, 2005) (new shipper

rev.) and accompanying Issues and Decision Mem., Cmt. 3; *Certain Frozen Warmwater Shrimp*

*From the Socialist Rep. of Vietnam*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007) (final

results) and accompanying Issues and Decision Mem., Cmt. 2).

Based on its findings on remand, Commerce recalculated Zhejiang's dumping margin for

the Adjusted POR and revised Zhejiang's dumping margin from 67.70 percent to 67.06 percent.

Remand Results at 35.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369,

1374 (Fed. Cir. 2003) ("As required by statute, [the court] will sustain the agency's antidumping

determinations unless they are unsupported by substantial evidence on the record, or otherwise

not in accordance with law." (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000))). "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938)).


## DISCUSSION

In cases where subject merchandise is from a nonmarket economy country, Commerce

determines its normal value by valuing the factors of production used in producing the

merchandise. Commerce generally values the factors of production by using prices from a market economy country, or surrogate country. 19 U.S.C. § 1677b(c)(1). To the extent possible, Commerce is directed to select a market economy country that is (1) at a level of economic development comparable to that of the nonmarket economy country; and (2) a significant producer of comparable merchandise. 19 U.S.C. § 1677b(c)(4). Commerce is also directed to use "the best available information regarding the values of such factors" in the market economy country that Commerce considered to be appropriate. 19 U.S.C. § 1677b(c)(1).

When choosing the "best available" surrogate data on the record, Commerce selects, to the extent practicable, surrogate data that "are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (citations omitted). The determination of which information is the "best" available requires making a comparison of data sets on the record. *See Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269 (2006) (observing that to choose the best available information Commerce must "conduct a fair *comparison* of the data sets on the record" (quoting *Allied Pac. Food (Dalian) Co. v. United States*, 30 CIT 736, 435 F. Supp. 2d 1295 (2006) (emphasis in original)). After comparing the available data sets, where there exist on the record "alternative sources of data that would be equally or more reliable . . . it is within Commerce's discretion to use either set of data." *Geum Poong Corp. v. United States*, 26 CIT 322, 326, 193 F. Supp. 2d 1363, 1369 (2002).

Here, Commerce's choice of India as the surrogate country is not in dispute. Rather, plaintiff challenges as unsupported by the record Commerce's selection of data to value Zhejiang's raw honey input, its adjustment of the raw honey price to account for inflation, and its failure to average two of MHPC's financial statements when calculating surrogate financial

ratios.

Turning to Commerce's selection of surrogate data to value raw honey, Commerce found both the March 2000 *Tribune* article and the March 2001 *Tribune* article were publicly available and product specific. Additionally, both were non-representative, because they contained regional instead of national prices, and were non-contemporaneous with the Adjusted POR. Commerce, however, found that the 2001 article contained internal inconsistencies that made it less reliable than the 2000 article. Specifically, the article suggested that imports from China, Argentina, Germany, and Australia had suppressed prices during a period when Indian government statistics showed that there were no imports from those countries. *See* March 2001 *Tribune* Article, Amended Record 123 at 15 ("Dr Madhu Gill, Chairperson of the Northern India Beekeepers Association says that the honey from China, Argentina, Germany, [and] Australia is landing in the country at a price varying between Rs 20 to 25 per kg. It has affected the bee-keepers in a big way."); Remand Results at 20 ("[T]he March 2001 article appeared to identify imports from four countries as suppressing Indian honey prices, but . . . Indian government import statistics did not show honey imports from those countries during the relevant period." (citing Decision Mem. at 11)). Further, it was not clear whether and to what extent the prices in the 2001 article were for honey sourced entirely in India. *See* March 2001 *Tribune* Article, Amended Record 123 at 15; Remand Results at 22 (noting that it was unclear "whether the prices from the raw honey market in Punjab include imports from other countries").

As reflected in the New Information, Commerce spoke with the authors of both articles about raw honey prices. *See* Amended Record 130 (memorializing Commerce's discussion with the author of the March 2000 *Tribune* article); Amended Record 123 (memorializing Commerce's discussion with the author of the March 2001 *Tribune* article). The author of the

2000 article, Mr. K. Sarangarajan, explained that "the raw honey price of Rs 25 to

45/kilogram . . . was from a raw honey market in Madras. He stated that this raw honey market is

a public market where raw honey is traded and these raw honey prices are written down, and

hence are publicly available at this particular market." Amended Record 130. He also conveyed

that he "believe[d] the current market trend [was] somewhere between Rs 45 to 75/kilogram."

Amended Record 130. The author of the 2001 article, Mr. Sarbjit Dhaliwal, explained that "the

raw honey price of Rs 24/kilogram . . . was from a raw honey market in Punjab. He stated that

this raw honey market is a public market where raw honey is traded and these raw honey prices

are written down, and hence are publicly available at this particular market." Amended Record

123. He went on to say "that the price of honey is highly elastic, depending upon supply, which

is effected [sic] by factors such as the weather and international competition." Amended Record

123.

    After considering the other New Information on the record, Commerce found that the

internal inconsistencies in the 2001 article persisted:

> [W]e continue to find that the March 2001 article contains internal inconsistencies
> that undermine the reliability and quality of the raw honey pricing information
> therein and is not substantiated by the data on the record. In particular, in the
> *Final Results*, the Department stated that the March 2001 article appeared to
> identify imports from four countries as suppressing Indian honey prices, but that
> Indian government import statistics did not show honey imports from those
> countries during the relevant period. Further, it is not clear whether the raw honey
> pricing information in [the 2001 article] refers to all raw honey sold in India, or
> only that sourced from China, Argentina, Germany, and Australia.

Remand Results at 20. Accordingly, Commerce concluded that "the March 2000 article

represents more reliable data, as [it] contains none of the internal inconsistencies that exist in the

March 2001 article . . . ." Remand Results at 21.

    Commerce's conclusion that the 2000 article was more reliable than the 2001 article is

reasonable based on the record. Although plaintiff insists that the discussions had between Commerce and the author of the 2001 article eliminated any questions about the article's reliability, Commerce's determination to the contrary is supported by the record. *See* Pl.'s Cmts. 19-20. While the conversations memorialized in Commerce's file notes clarified which markets the articles' respective prices came from—Madras in the case of the 2000 article and Punjab in the case of the 2001 article—it cannot be said that they resolved questions concerning the claimed price suppression by Chinese, Argentine, German, and Australian honey imports. Nor did they clarify the extent that the prices in the 2001 article may have reflected imported honey. As Commerce observed, the document memorializing the conversation with the author of the 2001 article "mentions that prices are affected by factors such as international competition, and does not clarify whether prices from the raw honey market in Punjab include imports from other countries." Remand Results at 22.

It is worth noting that the court's ruling here, that Commerce's selection of the 2000 article is reasonable, is consistent with this Court's holding in *Wuhan Bee Healthy, Co. v. United States*, 29 CIT 587, 374 F. Supp. 2d 1299 (2005). Although, as plaintiff notes, the court is not bound to follow the *Wuhan* decision, the *Wuhan* Court's reasoning is persuasive, given that there Commerce was faced with a choice between the same two articles presenting alternative pricing data for raw honey for a period of review that overlapped with the Adjusted POR here. In *Wuhan*, after weighing the information's public availability, specificity, breadth of market coverage, and contemporaneity, Commerce selected the 2000 article over the 2001 article. Upholding Commerce's choice, the Court stated, in pertinent part:

> Commerce is . . . justified in finding that it is not clear whether the [March 2001 *Tribune* article's] pricing information refers to all raw honey sold in India, or only that sourced from China, Argentina, Germany, and Australia. It is indeed unclear how Dr. Gill arrived at a procurement price of Rs. 24 and this lack of clarity is

compounded by the reference to selected countries. Though the information conveyed may be in two separate sentences, the sentences are part of a three-sentence string of related, if confusing, information. Finally, Commerce provided evidence tending to show that the prices stated in the article were not reliable. In particular, Commerce found that no honey was imported into India between April 2000 and March 2001 from Argentina, Germany, or China and that these same statistics also contradict the landed prices referenced in the 2001 article.

*Wuhan*, 29 CIT at 592, 374 F. Supp. 2d at 1304 (internal quotation marks and citations omitted).

Based on the record here, including the New Information, Commerce has supported with substantial evidence its finding that the internal inconsistencies in the March 2001 *Tribune* article made it a less reliable source than the March 2000 *Tribune* article, which did not suffer from the same inconsistencies.

Next, the court turns to Commerce's adjustment of the price of raw honey derived from the March 2000 *Tribune* article to account for inflation. Commerce adjusted the raw honey price for three separate time periods within the Adjusted POR: (1) February 2001 to December 2001; (2) December 2001 to May 2002; and (3) June 2002 to November 2002. Remand Results at 23.

For the first period, Commerce used Indian WPI data "to first inflate the [average raw honey price from the 2000 article] to January of 2001, and then to inflate it again using the Indian WPI for the time period February 2001 through December 2001." Remand Results at 23.

For the second time period, "to account for increases in Indian raw honey prices from December 2001, through May 2002, *in excess of inflation*, [Commerce] averaged raw honey purchase prices from . . . Tiwana and Jallowal . . . to calculate a total average raw honey price *for each month* for the period December 2001, through May 2002." Remand Results at 23 (emphasis added). Commerce next calculated "monthly price increases on a percentage-basis, and then applied these price increases to [the] adjusted raw honey price from the March 2000 article." Remand Results at 23. Then, Commerce calculated "a simple average of these adjusted monthly

raw honey prices to derive our raw honey surrogate value for the period for which [Commerce] had raw honey purchase pricing data (*i.e.*, December 1, 2001 to May 31, 2002)." Remand Results at 23-24.

For the third time period, *i.e.*, June 2002 to November 2002, Commerce "further adjusted the raw honey surrogate value for inflation by the average WPI." Remand Results at 24. To arrive at a single surrogate value for raw honey covering the entire Adjusted POR, Commerce summed the adjusted raw honey prices from the three periods and divided the sum by three. Remand Results at 24.

Plaintiff argues that Commerce's calculation of the inflated raw honey price is unsupported by substantial evidence. Plaintiff contests Commerce's rejection of its argument that Document 131 in the Amended Record supports placing a cap of Rs. 39 per kilogram on the adjusted price for the month of November 2002. *See* Pl.'s Cmts. 26 (noting that Commerce "rejected plaintiff['s] argument that the November 2002 inflated price should be capped at 39 Rs./kg based on information solicited . . . from [Commerce's] sources in India . . ."). Specifically, plaintiff cites to an email included in Document 131 that contains "information regarding increased prices reported by Santosh Singh," an Agricultural Specialist with the United States Department of Agriculture. Pl.'s Cmts. 27 (citing Amended Record 131 at 37-38 (the "Singh Email")).

In 2003, Mr. Singh was based at the U.S. Embassy in New Delhi. He assisted in fulfilling a research request from Commerce's honey team in Washington, D.C. The honey team was seeking publicly available prices of domestic bulk raw honey in India for the period May 2002 to November 2002. In the email in question, Mr. Singh stated:

> After contacting a whole range of possible data sources . . . throughout the country, I have been unable to locate any organization (government or industry

association) compiling prices for bulk raw honey in India. Consequently, we are
unable to provide you quotable (published or publically available) prices for any
market in India.

Singh Email at 37. Mr. Singh went on to provide information that he obtained from "private

trade contacts in the Punjab market," including prices ranging from $0.74 to $0.86 per kilogram

during the requested period. Singh Email at 37. Commerce subsequently followed up with Mr.

Singh to ask for additional information to support this pricing information, including price

certifications from data sources, but such information was not available. *See* Amended Record

131 at 34-35.

Commerce's regulations indicate a preference to use publicly available data to value

factors of production. 19 C.F.R. § 351.408(c)(1) (2015) ("The Secretary normally will use

publicly available information to value factors."). This is particularly true when valuing material

inputs "because the use of public information for material inputs tends to yield more

representative data reflecting numerous transactions between many buyers and sellers." *Since

Hardware (Guangzhou) Co. v. United States*, 38 CIT __, __, 977 F. Supp. 2d 1347, 1352 (2014),

*aff'd* 636 Fed. Appx. 800 (Mem.) (Fed. Cir. 2016) (summarizing Commerce's explanation of its

regulatory preference for publicly available information as stated in 19 C.F.R. § 351.408(c)).

Here, Commerce examined Document 131, including the Singh Email. The Department

observed that "[t]he information in this document appear[ed] to be prices obtained from sources

that [were] not publicly-available and this information [was] not substantiated. Thus, there [was]

no publicly available information on the record which would direct [Commerce] to change its

methodology and cap the inflator." Remand Results at 24-25. Plaintiff contends that Commerce

unreasonably declined to rely on the Singh Email solely because it contained information that

was not publicly available. Plaintiff argues that since Commerce's "preference that surrogate

values should be based on publically available information is not a *per se* rule, but is designed to ensure that the data provided is reliable, [Commerce's] rational[e] for rejecting [Zhejiang's] argument cannot be sustained." Pl.'s Cmts. 27 (citations omitted). Plaintiff also maintains that it was "inconsistent" for Commerce to reject the Jallowal and Tiwana pricing information for use in calculating the surrogate value for raw honey but to accept it for purposes of adjusting the raw honey price. Plaintiff suggests that such information "do[es] not fall within the Department's traditional definition of publically available information." Pl.'s Cmts. 27.

Commerce's decision not to rely on the non-public, unsubstantiated information in the Singh Email was reasonable. Despite plaintiff's argument to the contrary, the Department did not decline to use the information contained in the Singh Email solely because it was not public. Rather, it is apparent from the Remand Results that Commerce considered plaintiff's argument in light of the record before it and determined that the Singh Email pricing information was not only not publicly available but also unsubstantiated—a finding that is supported by the record. Remand Results at 24; Amended Record 131 at 34 ("Based on our thorough research the additional data you requested [*i.e.*, price certifications from each of the companies whose private pricing information was shared with Mr. Singh] is not available.").

Moreover, plaintiff's argument that it was "inconsistent" for Commerce to reject the Jallowal and Tiwana pricing information for use in calculating the surrogate value for raw honey but to accept it for purposes of calculating the inflator is unconvincing.[4] The plaintiff in *Wuhan*

---

[4]     Plaintiff asserts that the Jallowal and Tiwana pricing information was not public; however, that is not the reason provided by Commerce for declining to use such information to determine a surrogate value for raw honey. Rather, Commerce explained that while the Jallowal and Tiwana raw honey purchase prices were "documented" (*i.e.*, substantiated) they were specific only to two companies in India in a particular region, Punjab. Thus, because of the

(footnote continued)

similarly argued that "Commerce's use of the Jallowal and Tiwana . . . data to adjust the

surrogate value for raw honey cannot be reconciled with its rejection of that same data as not

country-wide." *Wuhan*, 29 CIT at 593, 374 F. Supp. 2d at 1305 (citation and quotation marks

omitted). This Court disagreed:

> Commerce's decision to reject the Jallowal and Tiwana . . . data for use in
> calculating the surrogate value for raw honey was based on separate criteria from
> its decision to use the data to calculate the inflator. In the absence of any other
> pertinent information on the record, the court finds reasonable Commerce's
> decision to use the Jallowal and Tiwana . . . data for this limited purpose.

*Id.* at 594, 374 F. Supp. 2d at 1305.

The Court's reasoning applies equally here. In the Remand Results, the Department

determined that the March 2000 *Tribune* article was the best information available to calculate a

surrogate value for raw honey—a decision based on a set of criteria, namely, the public

availability, specificity, representativeness, and contemporaneity of the data, long approved by

this Court for purposes of determining whether surrogate value data constituted the best available

information. *See QVD Food Co. v. United States*, 34 CIT 1166, 1168, 721 F. Supp. 2d 1311,

1315 (2010), *aff'd*, 658 F.3d 1318 (Fed. Cir. 2011); *Qingdao Sea-Line Trading Co. v. United

States*, 37 CIT __, __, Slip Op. 13-102 at 6-7 (Aug. 8, 2013), *aff'd*, 766 F.3d 1378 (Fed. Cir.

2014) ("In selecting the best available information for valuing the factors of production,

Commerce's practice is to select surrogate values that 'reflect[] a broad market average, [are]

publicly available, contemporaneous with the period of review, specific to the input in question,

and exclusive of taxes on exports.'" (quoting *QVD Food Co.*, 34 CIT at 1168, 721 F. Supp. 2d at

1315)). Separately, to account for the price increases during the December 2001 to May 2002

---

data's "limited coverage," the Department found that it was not the best available information to
value the raw honey input. Decision Mem. at 16.

period, the Department followed its practice "to use an inflator specific to a commodity in cases where the price[] changes for that commodity are significantly different from general inflation." Remand Results at 24 (citing *Fresh Garlic From the PRC*, 76 Fed. Reg. 37,321 (Dep't Commerce June 27, 2011), and accompanying Issues and Decision Mem., Cmt. 4). In other words, Commerce "used the price quotes from the [Jallowal and Tiwana] bee farms for the narrow purpose of supporting its inflation methodology, given that prices from these farms demonstrated that raw honey prices increased at a significantly greater rate than a standard inflation rate." Def.'s Reply at 18 (citations omitted). Given the absence of any other reliable data on the record regarding the observed price increases, Commerce reasonably determined that the Jallowal and Tiwana pricing data was the best information available for the limited purpose of accounting for those increases. *See Wuhan*, 29 CIT at 594, 374 F. Supp. 2d at 1305.

Finally, the court examines Commerce's decision to rely solely on MHPC's 2001-2002 financial statement instead of averaging it with the 2002-2003 financial statement. In the Remand Results, Commerce compared the 2001-2002 and 2002-2003 financial statements and found that the 2001-2002 statement was specific, *i.e.*, "narrowly tailored to subject merchandise," and more contemporaneous with the Adjusted POR than the 2002-2003 financial statement. Remand Results at 26. The 2001-2002 financial statement covered April 2001 to March 2002—an overlap with the Adjusted POR of ten months, while MHPC's 2002-2003 financial statement covered April 2002 to March 2003—an overlap of eight months. Remand Results at 26.

Commerce declined to average the two financial statements, as proposed by Zhejiang, finding that its practice was "not to average financial statements for the same company when calculating surrogate values for financial ratios. Instead, under the [nonmarket economy]

methodology, when deemed reliable, it is [Commerce's] established practice to select the most

contemporaneous surrogate values to value the factors-of-production and financial ratios."

Remand Results at 33 (citing *Honey From the PRC*, 70 Fed. Reg. at 9271 and accompanying

Issues and Decision Mem., Cmt. 2; *Certain Frozen Warmwater Shrimp From the Socialist Rep.*

*of Vietnam*, 72 Fed. Reg. at 52,052, and accompanying Issues and Decision Mem., Cmt. 2

(discussing Commerce's practice in nonmarket economy proceedings to "use one set of financial

statements from a company that overlaps the most months of the appropriate [period of

review]")). The Department explained the rationale for this practice:

> Averaging two financial statements from the same company does not result in a
> more accurate representation of the Indian honey industry because the Department
> 'would be deriving financial ratios based on data that is less contemporaneous and
> creating a temporally less representative method for deriving financial ratios than
> simply using the most contemporaneous financial statements' were it to average
> both of MHPC's financial statements.

Remand Results at 33 (quoting *Certain Frozen Warmwater Shrimp from the Socialist Rep. of*

*Vietnam*, 72 Fed. Reg. at 52,052, and accompanying Issues and Decision Mem., Cmt. 2). In other

words, because the less contemporaneous financial statement (*i.e.*, the 2002-2003 statement) is

less representative of MHPC's factory overhead, SG&A, and profit during the Adjusted POR,

including the 2002-2003 data in Commerce's financial ratio calculations would have resulted in

a less accurate margin.

Plaintiff challenges neither Commerce's practice nor the quality and reliability of the

2001-2002 statement, but rather argues that Commerce acted arbitrarily by "ignor[ing] the

essential similarity of the two statements." Pl.'s Cmts. 30. Moreover, plaintiff contends that

"there was [a] dramatic difference in profit realized by MHPC on its resale of processed honey in

FY 2002/03 fiscal year . . . compared [to] FY 2001/02 . . . leading to an even more dramatic

difference in overall financial ratios," and Commerce's failure to account for this difference was

to ignore commercial reality. Pl.'s Cmts. 29-30.

To the extent plaintiff argues that Commerce failed to consider MHPC's 2002-2003 financial statement, it is evident in the Remand Results that Commerce compared the statements in terms of their contemporaneity, representativeness, and specificity and found the 2001-2002 statement to be superior in quality. Remand Results at 27 ("We continue to find that there are two principal problems with Zhejiang's proposal: non-contemporaneity and the lack of representativeness of the data."). As the defendant observes, plaintiff's argument "fails to demonstrate that [the 2002-2003 financial statement was] the best available data, other than to argue that that the differences in profits . . . [led] to a 'dramatic difference' in overall financial ratios." Def.'s Reply 19. Plaintiff points to no legal authority to support its claim that Commerce erred here in following its established practice regarding averaging statements from the same company. Moreover, plaintiff does not deny that the 2001-2002 statement satisfies the criteria Commerce traditionally considers in evaluating sources of surrogate data. *See Qingdao*, 766 F.3d at 1386 (Commerce considers whether surrogate data "are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review"). Commerce reasonably determined that MHPC's 2001-2002 financial statement met the criteria for quality and reliability and justified its decision not to average the two financial statements based on its established practice. Accordingly, Commerce's selection of MHPC's 2001-2002 financial statement was reasonable.

**CONCLUSION**

In the end, plaintiff has failed to show that the information it prefers for determining its rate is superior to that used by Commerce. Thus, for the foregoing reasons, the court sustains the

Remand Results as supported by substantial evidence and otherwise in accordance with law.

Judgment will be entered accordingly.


                                                        /s/ Richard K. Eaton
                                                     Richard K. Eaton, Judge


Dated:          June 1, 2017
                New York, New York